### CULLEN *v.* VOORHIES.

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—TRUSTS—BREACH OF
TRUST—EVIDENCE—VALUE—DIRECTED VERDICT.
    In an action for damages for the alleged wrongful selling
        of plaintiff's business and assets which defendants held
        under a trust agreement for the benefit of creditors, evi-
        dence as to the value of the business, which was run at
        a loss for several years, *held,* to warrant a directed verdict
        in favor of defendants.[1]

2. JUDGMENT—NON OBSTANTE VEREDICTO—JURISDICTION—STATUTE
—RESERVATION OF DECISION ON MOTION..
    The contention of plaintiff that the trial court was with-
        out jurisdiction to enter judgment *non obstante veredicto*
        for defendants in the absence of a request therefor at
        the close of the testimony under Act No. 217, Pub. Acts
        1915 (3 Comp. Laws 1915, § 14568 *et seq.*) is disposed
        of by the statement of the judge that decision of defend-
        ant's motion for a directed verdict was reserved pending
        submission of the case to the jury as provided by statute.[2]

[1]Assignments for Benefit of Creditors, 5 C. J. § 369; [2]Judg-
ments, 33 C. J. § 115.

3. EVIDENCE—JUDICIAL NOTICE.

> The Supreme Court will take judicial notice that in
> Wayne county the terms of the circuit court are but
> one month apart, and that the trial judges are, as a
> rule, very busy.[3]

4. JUDGMENT—NON OBSTANTE VEREDICTO—CONSTRUCTION OF COURT
RULE SHOULD GIVE EFFECT TO ITS PURPOSE.

> Circuit Court Rule No. 44, requiring entry of judgment
> *non obstante veredicto* before the conclusion of the next
> term of court, should be construed to give effect to its
> purpose of encouraging the speedy ending of litigation.[4]

5. SAME.

> In view of the fact that the terms of the Wayne circuit
> court are only one month apart, and that the purpose
> of Circuit Court Rule No. 44 is to encourage the speedy
> ending of litigation, entry of judgment *non obstante vere-*
> *dicto* will be sustained, although nearly five months had
> elapsed before said entry was made, where a long time
> would be required for retrial and the result must be the
> same.[5]

Error to Wayne; Moynihan (Joseph A.), J.   Sub-
mitted June 2, 1925.   (Docket No. 6.)   Decided
October 1, 1925.

Assumpsit by Alexander F. Cullen against Christo-
pher R. Voorhies, Arnott H. Moody and others for
breach of a trust agreement.   Judgment for defend-
ants *non obstante veredicto*.   Plaintiff brings error.
Affirmed.

*Charles Bowles* and *Arthur S. Nichols*, for appellant.

*Lightner, Oxtoby, Hanley & Crawford* (*Clifford M.
Toohy*, of counsel), for appellees (except Voorhies).

MOORE, J.   This is an action brought by plaintiff
to recover damages for the breach of a trust agree-
ment, executed by plaintiff as party of the first part,
and by the defendants.   Said contract is dated June

---

[3]Evidence, 23 C. J. § 1909; [4]Judgments, 33 C. J. § 111; [5]Id., 33
C. J. § 111.

14, 1921. At the conclusion of plaintiff's proofs, defendants made a motion for directed verdict, which was taken under advisement by the court. After the testimony was all in the case was submitted to the jury which rendered a verdict for plaintiff for $30,000. This was on May 4, 1923. On May 11, 1923, all of the defendants except C. R. Voorhies, who made no defense at all to the suit, filed a motion for judgment notwithstanding the verdict, which was duly argued and submitted on May 17, 1923. On October 12, 1923, the court rendered its opinion granting said motion, and judgment was accordingly entered for defendants on October 18, 1923.

We quote from the brief:

"The plaintiff relies upon seven assignments of error, but the questions raised thereby may be grouped and discussed as follows:

"(1) Under the proofs there was an issue of fact for the consideration of the jury, and the defendants' motion for judgment *non obstante* should have been denied; and

"(2) The court was without jurisdiction to grant defendants' motion for judgment notwithstanding the verdict."

The counsel for defendants criticize the statement of facts made by the plaintiff and call attention in detail to corrections which they claim should be made. They also say that the statement of facts in the opinion of the trial judge, made when the judgment was entered, is a correct statement of the facts. We have read every word of the voluminous record and think the statement of facts by the trial judge is fully justified by the record. We quote as follows:

"This is an action brought by plaintiff against all of the named defendants to recover damages for the alleged breach of a certain contract between the parties, dated June 14, 1921.

"It is the claim of the plaintiff that at the time of the execution of the contract he was the owner of

a machine shop in the city of Detroit, which was a going concern and of considerable value. It is his claim that the defendants disregarded the terms of the contract herein referred to, and wrongfully sold his business and dissipated his assets. The issue having been submitted to a jury, a verdict was returned against all of the defendants in the sum of thirty thousand dollars ($30,000).

"At the close of plaintiff's proofs, on behalf of all of the defendants except Voorhies, a motion was made for a direction of a verdict of no cause of action, and at the close of all of the proofs, the motion was renewed. The court reserved its decision upon both the motion and the renewal thereof, pending the submission of the case to the jury, as provided by statute.

"Following the verdict of the jury, on behalf of all of the defendants except Voorhies, a motion was made that judgment of no cause of action be entered, notwithstanding the verdict. An alternative motion was likewise submitted on behalf of the same defendants praying for a new trial. This motion was based upon 14 different reasons, but we do not deem it necessary to mention at this time any other than the first two, namely, that the verdict was contrary to the overwhelming weight of the evidence, and that the verdict was excessive.

"It appears from the evidence that in 1917 plaintiff opened a small machine shop, with an invested capital of approximately $600. Through the efforts of an associate in the business, one Avery by name, one Van Wie was induced in 1918 to become a partner of Cullen, investing a total of $3,000 in the business. In 1919 Van Wie sold his one-half interest in the business to Cullen for $6,500, the major part of the consideration being represented by notes secured by a chattel mortgage upon the business.

"After Van Wie sold out, Cullen became interested in the manufacture of a truck jack and gradually converted his business from a machine shop to a jack manufacturing business. The new venture proved to be a complete failure and by the early part of 1921, Cullen found himself in acute financial difficulties. He was forced to let go most of his employees; he was unable to meet the Van Wie notes

as they matured; other creditors were pressing their claims, and finally his landlord served notice to quit for nonpayment of rent.

"It clearly appears from the evidence that Cullen's financial difficulties began as early as 1920, and in order to secure funds to keep the business going, he conceived the plan of drawing fraudulent trade acceptances upon an employee, and upon a neighbor. These trade acceptances amounted in all to approximately $10,000, and were discounted by plaintiff with defendant the Peoples State Bank.

"About this time Cullen also borrowed from defendant Voorhies the sum of $2,800, and in the spring of 1921, when it is very apparent that it became evident to Cullen that he was hopelessly insolvent, he executed a note to Voorhies in the sum of $14,800, secured by a chattel mortgage which was duly filed of record.

"It is quite clear from the testimony, both of Cullen and Voorhies, that this mortgage was conceived in fraud. The testimony upon this point, both of Cullen and Voorhies, is so replete with obviously false statements, which it is unnecessary to review here, that no reasonable person could come to any other conclusion but that the testimony upon this point both of Cullen and Voorhies was given for the purpose of working a fraud upon the other defendants and leads the court to the opinion that the testimony neither of Cullen nor of Voorhies can be believed unless verified by other trustworthy witnesses.

"The story of the withdrawal of the $12,000 by Voorhies, the turning over of this to Cullen, and then the payment of it by the latter to his brother, carries within itself evidence of its falsity and of the plan of Cullen, with the assistance of Voorhies, to defraud his creditors. Shortly after the execution of the Voorhies mortgage, and after the notice to quit had been served, Cullen and Voorhies consulted Mr. Edward McCarthy, a reputable member of the Detroit bar, concerning Cullen's financial affairs. Cullen gave to Mr. McCarthy a financial statement showing assets of $15,000 and liabilities in excess of $40,000. It afterwards developed that the statement greatly over-estimated the assets. A creditors' meeting was thereupon called, and it was agreed that Cullen should

turn over his business to a group of trustees, an extension of time was to be given by Cullen, and he was to act under the trustees as foreman or in some other such capacity. This agreement was reduced to writing, and it is for the alleged breach of it that this action was brought. As a condition of the trust agreement, it was required that the Voorhies mortgage be released. Nothing was done, however, regarding the Van Wie mortgage, as its existence was not learned of by the trustees until a considerable time later.

"Under the new arrangement, the business became even less profitable than it had been, and as sufficient money was not taken in even to pay the rent, Cullen was evicted in the fall. The trustees had advanced money to pay the back rent, but declined to advance funds to pay the rent accruing after the trust agreement.

"After the machinery and other materials were put in storage following the eviction, meetings of the creditors and trustees were called at which consideration was given to the question of selling this machinery and material. Voorhies was present at the meetings and Cullen was in an adjoining room. The testimony of Mr. McCarthy and Mr. Jones, also a reputable lawyer, to the effect that Cullen was continually kept advised upon these meetings, is convincing.

"A plan was devised whereby, with money advanced by one of the creditors, Voorhies was to bid $1,900 for the stock and machinery. This plan was then changed so that the bid was to be made by the Baird Machinery Company, who were then to enter into contract to sell the machinery, etc., to Voorhies for $1,900, plus the amount of Cullen's open accounts with that concern. The construction of a shop was begun by Cullen and Voorhies in the rear of Cullen's house. The court is of the opinion that Cullen well knew of all of the matters in connection with the sale of the machinery, and assented thereto, and had some interest with Voorhies in the purchase.

"From the evidence given by Cullen's former bookkeeper, based upon his account books, it appeared that each year that Cullen was in business, a loss resulted. Neither the books nor the annual statements in them

were made for litigation, and the court is of the opinion that the testimony of Avery, based upon an incomplete review of the books, should have carried no weight as against the evidence of the books themselves.

"Were this only a motion for a new trial the court would feel constrained to set aside the verdict and grant a new trial, as the court is of the opinion that the verdict was against the great weight of the evidence, and was excessive. Because of my opinion that Cullen knew and assented to all of the material acts of the trustees, and that the business at the time of the sale had no net value whatsoever, and as it always had been a losing business, the amount of the verdict was out of all proportion to any damage that Cullen might have suffered, even though the trustees did not observe the terms of the trust agreement.

"The court is of the opinion, however, that the verdict of the jury should be set aside, and that judgment should be entered in favor of the defendants, notwithstanding the verdict, for the reason that there was no competent evidence that the trustees violated the terms of the trust agreement, and that there was no obligation upon them to pay out of their own funds continuing expenses or indefinitely maintaining the shop. Cullen was guilty of fraud in withholding from the trustees and creditors the fact that the machinery was covered by the Van Wie chattel mortgage, therefore, there was no obligation upon the trustees to pay their money into this business to keep it going when Van Wie by the terms of his mortgage, then in default, might have taken the machinery covered by it whenever he saw fit. The trust agreement was made on the assumption that Cullen's license to manufacture the jacks was a valuable asset, and inasmuch as it was shown by the proofs that this license had been terminated, the failure of Cullen to disclose this fact to the trustees amounted in the opinion of the court, to fraud sufficient to vitiate the trust agreement.

"We are of the opinion, too, even though it be a question of fact as to whether or not Cullen was aware of the plan for selling the business, that his later acquiescing in it, amounted to an estoppel which

prevents him from claiming that such conduct was a breach of the contract.

"The testimony is undisputed to the effect that an insolvent business that was losing and always had lost money was of no value. The books of the business show that this was the true state of affairs. Therefore, there would be no basis upon which to estimate damages, even though there was a breach of the contract.

"For the foregoing reasons, the verdict will be set aside, and judgment be entered of no cause of action.

"Inasmuch as the rights and obligations of defendant Voorhies are on the same basis as of the remaining defendants, judgment will run in his favor also, notwithstanding the fact that he did not join the remaining defendants in the motion herein considered.

> "JOSEPH A. MOYNIHAN,
> "Circuit Judge.

"October 11, 1923."

It may be well to quote some of the testimony. Mrs. Barr, who was at one time the bookkeeper of the plaintiff, was called by him as a witness. She testified that two of the books of original entries were missing. We quote some of her cross-examination:

"Q. So that this shows all the income that the business made before charging off expenses?

"A. Yes, sir.

"Q. Was $23,671.16?

"A. Yes, sir.

"Q. And that total expenses to be charged against that were $23,908.77?

"A. Yes, sir.

"Q. Well, then, that would indicate a loss of about $130 on the year, wouldn't it—$23,908.77—$23,671— just figuring briefly from that what would be the net loss for the year?

"A. $237.61 loss.

"Q. Loss for the year 1918. Now was there any such account kept for 1919, do you know? What does this mean, which was a similar journal entry for 1919, indicate as a profit or loss of the business?

"A. I will have to take the same figures again, $2,085.93.

"*Q.* Those are the profits?

"*A.* No.

"*Q.* That is the loss or gain?

"*A.* Loss.

"*Q.* $2,085.93 loss for 1919.    Now let us see 1920. Here you are.    Now figure out what the result was in 1920, if you please?

"*A.* $3,900.11."

There is no competent testimony in the case that shows any different result.    A witness was introduced by the plaintiff who had made an examination of the books and testified to a profit in three years of $30,320. On the cross-examination the following developed:

"She (Mrs. Barr) shows a footing of $60,600. There is a difference of $28,000 in accounts receivable according to the footing.    If her footing is right and my footing is wrong, then the proofs that I have showed there are decreased $28,000, if that is true. Assuming that her addition is correct and mine incorrect, that would diminish the profits $28,000.    If I were to charge the full amount of salary that is credited to salary account as distinguished from my charge of only cash, that makes a difference of $3,000 more and $3,000 and $28,000 of course, makes $31,000, so that those two items alone, if her figures are correct, wipe out all the profits shown by me and my accounting.

"*Mr. Welsh:* Mr. Avery, in order to determine whether those books are correct, what would you have to do to determine that point?

"*A.* Well, you would have to take a balance off first to see that the items were entered under the correct account and a double entry was made of an equal amount on each side, that is all; that would tell you.    Then you would have to trace back each account—each item to the original vouchers—the original entry in the original entry book.

"I have not had all those books and I have not made a trial balance.    I have not checked it back to the original source.    So far as these books are concerned, I cannot swear that they are not correct and true. The figures that I have taken and used in my computations were taken from these books.    I took them

for what they were worth. I have not checked back to see whether these figures which I have used are correct in the method of taking a trial balance and checking back the original voucher, I do not know then that the figures which I have taken and used are true and correct. I could not swear that they are true and correct. Therefore my computation so far as I go, depends entirely upon figures which I am not ready under oath to say are correct. I do not know anything about whether they are or not."

Based upon the direct testimony of this witness the following question was put to a witness called by the plaintiff as an expert:

"*Mr. Bowles:* The evidence shows it was a general machine shop up to the month of October, 1920, at which time the general machine business was discontinued and a transition was made from machine work —the general machine work which was dropped, and the business was turned over to be devoted to the manufacture of a certain jack, but that up to the first of September, 1920, the net earnings were $30,320.23. Now, Mr. Rogers, basing your opinion upon the facts which I have given you, and your experience as a business man in the city of Detroit, what would you say was the value of that business as a going concern?  *  *  *

"*A.* A business of that kind should be worth ten times its actual net earnings over an average of three years from the time—that is, the value three years prior to the time the valuation is to be taken.

"*Q.* Well, the average net earnings here would be slightly more than $10,000 a year, then what would be your judgment as to the valuation of the business as a going concern?

"*A.* It would be worth ten times that amount or approximately, whatever the odd figures would be over a hundred thousand dollars."

On the cross-examination he testified in part as follows:

"*Q.* Suppose this business described by Mr. Bowles during the year 1918, and I want to call your attention particularly to the year as relates to the general

business condition of the thing—during the year 1918, it lost $237; during the year 1919, it lost $2,085, the managing owner being paid a salary of $2,400—credited with a salary of $2,400, and that year it lost $2,085—in 1920, the main owner being credited with a salary of $2,400 a year, it lost $3,900. * * * That in 1921 it showed even greater losses in proportion than those I have related—would you say the business was worth anything? * * *

"(Question repeated), leaving out the year 1921—suppose this business described to you by Mr. Bowles during the year 1918 and I call your attention particularly to the year as relating to the general business condition of the thing—during the year 1918, it lost $237 during the year 1919, it lost $2,085, the managing owner being credited with a salary of $2,400, and that year it lost $2,085; in 1921, the main owner being credited with a salary of $2,400 a year, it lost $3,900 so that for the three years, 1918, that is the year of the war, 1919, the year following the war and 1920, there was three continuous years of losses—that the business was started in the fall of 1917, and never from the time it was started sold (showed) a profit?

"A. If you actually showed a loss you would have no particular value as a going concern other than the fact that the machinery was there ready to be operated —the fact that it was all assembled and ready to go.

"Q. But a business that had never made any money over a period of over three years is not worth much as a going concern, is it?

"A. No, sir. * * *

"It would have no value whatever as a going concern if there was a showing of a continued loss. * * * I say that the value of a business which · was losing money would be only such as the machinery therein placed would be reasonably worth, less the debts."

Redirect-examination by Mr. Bowles:

"Q. So that the business would be just as valuable that was run at a loss every year as one that was making a profit every year, provided you eliminated your debts at the end of any particular period you wanted to take it over?

"*A.* No, sir, it would not be.

"*Q.* So that the business that has been for three years losing money every year would be just as valuable to you to take it over now, if the debts would be forgotten, as a business that had been making money for three years and you took it over?

"*A.* No, sir. There is a big difference between a profitable business and an unprofitable business. The debts are a big factor in determining the value of a business as a going concern, because the value of the business as a going concern means the value based upon the probability that it will earn money. If all the experience in the business had been that it would lose money, I would not take such a business as a gift and operate it unless I could see that by changing the management it could be made to make money. If I could manage it more efficiently than it had been managed and I could show a profit, I would be willing to buy it, otherwise I would not want it for nothing, if it had to be operated at a loss. So the fact that debts had been piling up has a distinct determining influence in getting at its value, outside of the debts themselves."

All the other testimony as to values offered by the plaintiff turned out the same way. We think it clear from the record that each of the motions for a directed verdict on the part of the defendants should have been granted.

The question remains, Was the court without jurisdiction to grant defendants' motion for judgment? We again quote from the brief:

"It is our claim that the procedure followed by defendants in the trial did not bring the case within the purview of Act No. 217 of the Public Acts of 1915 (3 Comp. Laws, 1915, § 14568 *et seq.*), and even if the case did come within the purview of said act, the court lost jurisdiction to enter judgment *non obstante* for the reason that under Rule 44, the decision of the court should have been rendered before the conclusion of the next ensuing term after the verdict was rendered.

"In the first place, to bring the case under said act,

it is necessary that a request for directed verdict be made at the close of the testimony, and unless so made, the court certainly would have no jurisdiction, in any event, to enter judgment under said act contrary to the verdict.    The statute provides as follows:

"'SECTION 1. Hereafter in all civil actions at law, in courts of record, if either party shall at the close of the testimony, and before the case is submitted to the jury, request the court for a directed verdict in his favor, the court may reserve his decision thereon, and submit the case to the jury under proper instructions as to the law applicable to such case.'

"Inasmuch as no motion was made by the defendants for a directed verdict at the close of the testimony, we do not see how it can be here claimed that the court had any jurisdiction to enter judgment notwithstanding the verdict under the provisions of said act.

"Irrespective of the procedure followed by defendants at the trial of the case, however, the court certainly lost jurisdiction to enter judgment for the defendants, notwithstanding the verdict, after the lapse of nearly five months following the argument and submission of defendants' motion for that purpose.    If such an order was to be entered by the trial court, under the provisions of Rule 44, it had to be entered before the conclusion of the next ensuing term of court, and when this was not done, we submit that the trial court lost jurisdiction to make any such order, and the plaintiff was entitled to enter judgment on his verdict.    This court, we believe, will take judicial notice of the fact that in the Wayne circuit court, each month constitutes a term of court."

The statement of the trial judge in that portion of his opinion which we have quoted where he says:

"At the close of plaintiff's proofs, on behalf of all of the defendants except Voorhies, a motion was made for a direction of a verdict of no cause of action, and at the close of all of the proofs, the motion was renewed.    The court reserved its decision upon both the motion and the renewal thereof, pending the submission of the case to the jury, as provided by statute."

disposes of the suggestion of counsel about the statute.

Does Circuit Court Rule No. 44 invalidate the judgment? The motion for judgment was promptly made. It was not the fault of counsel or client that it was not promptly decided. In most circuit courts there are but four terms each year. We may take judicial notice that in Wayne county the terms are but one month apart, and that the trial judges are, as a rule, very busy. The purpose of the rule was to encourage the speedy ending of litigation, and we think it should be construed in such a way as to bring about that result, instead of requiring a long case to be tried all over again, when the result must be the same.

The judgment is affirmed, with costs to the appellees.

McDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, and FELLOWS, JJ., concurred. WIEST, J., did not sit.